BC

RECEIVED MAM
3/3/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

FILED B.I
3/12/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

David Martin,
Plaintiff,

v.

UBER TECHNOLOGIES, INC., a Delaware corporation; RASIER, LLC, a Delaware limited liability company (collectively "Uber");
LYFT, INC., a Delaware corporation;
CITY OF CHICAGO, a municipal corporation,

Defendants.

1:26-cv-02431
Judge Elaine E. Bucklo
Magistrate Judge Keri L. Holleb Hotaling
RANDOM / Cat. 2

Case No.: __________

**VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF**

## NATURE OF THE ACTION

This is a civil action brought by Plaintiff David Martin, a licensed Transportation Network Provider ("TNP") chauffeur, against Defendants Uber Technologies, Inc. and Rasier, LLC (collectively "Uber"), Lyft, Inc. ("Lyft"), and the City of Chicago, arising from the wrongful and permanent deactivation of Plaintiff's rideshare accounts on both the Uber and Lyft platforms, and the unconstitutional enforcement of the City of Chicago's Transportation Network Provider Ordinance that facilitated that exclusion. Plaintiff purchased a vehicle specifically to work as a rideshare driver, invested substantial resources in building his livelihood on these platforms, and drove professionally and without incident. Despite this, Plaintiff's accounts were permanently deactivated based on anonymous, unverified complaints. Uber cannot produce verifiable

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

contact information for two of three accusers, and one of those very complaints was directly contradicted by Uber under oath in court proceedings. When Plaintiff refused to accept an inadequate settlement offer and continued to pursue justice, he was subjected to a pattern of suspicious encounters and a surge of baseless complaints that resulted in a second permanent deactivation. Plaintiff possesses dashcam video that will disprove the allegations against him. As a result of these deactivations, facilitated by the City of Chicago's TNP Ordinance reporting mechanism and causing Lyft to deactivate Plaintiff without any independent investigation, Plaintiff has been permanently excluded from the entire rideshare industry, his sole source of income, and continues to incur $650.50 per month in vehicle costs with no means to pay them. Plaintiff seeks preliminary and permanent injunctive relief, declaratory judgment, compensatory and punitive damages, treble damages under the antitrust laws, and attorney's fees and costs.

## PARTIES

1. Plaintiff David Martin is a natural person residing at 5724 Kathryn Lane, Matteson, Cook County, Illinois 60443. He is a resident of Cook County and a citizen of the State of Illinois. Plaintiff may be reached by telephone at (773) 893-0813 or by e-mail at davidmartinlitigation@gmail.com. At all times relevant to this Complaint, Plaintiff was a licensed Transportation Network Provider (TNP) chauffeur operating as an independent contractor on the Uber and Lyft platforms in the City of Chicago.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

2. Defendant Uber Technologies, Inc. ("Uber") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1515 3rd Street, San Francisco, California 94158. Uber is registered to do business in the State of Illinois and may be served through its registered agent, CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, Illinois 60604-1101. Uber operates a nationwide on-demand transportation network platform and conducts substantial business within the Northern District of Illinois.

3. Defendant Rasier, LLC ("Rasier") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 1725 3rd Street, San Francisco, California 94158. Rasier is a wholly owned subsidiary of Uber Technologies, Inc. and is the contracting entity identified in Uber's Terms of Service as the party entering into agreements with drivers, including Plaintiff. Rasier is registered to do business in the State of Illinois and may be served through its registered agent, CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, Illinois 60604-1101. At all times relevant to this Complaint, Uber Technologies, Inc. and Rasier, LLC acted jointly and are referred to collectively herein as "Uber."

4. Defendant Lyft, Inc. ("Lyft") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 185 Berry Street, Suite 5000, San Francisco, California 94107. Lyft is registered to do business in the State of Illinois and may be served through its registered agent, CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, Illinois 60604-1101. Like Uber, Lyft is a transportation

network company that operates a smartphone-based rideshare platform, connecting passengers seeking on-demand transportation with independent drivers for hire. Lyft is the second-largest rideshare company in the United States and a direct competitor of Uber in the Chicago market. Lyft conducts substantial business within the Northern District of Illinois.

5. Defendant City of Chicago is a municipal corporation organized and existing under the laws of the State of Illinois, with its principal offices located at City Hall, 121 North LaSalle Street, Chicago, Illinois 60602. The City of Chicago may be served through its Corporation Counsel, City of Chicago Department of Law, 121 North LaSalle Street, Suite 600, Chicago, Illinois 60602. At all times relevant to this Complaint, the City of Chicago acted under color of state law in enacting and enforcing the Transportation Network Provider Ordinance, including Rule TNP 1.10.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 (Count IV) and the Sherman Antitrust Act, 15 U.S.C. §§ 1–2 (Count III).

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

8. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district, all Defendants conduct substantial business in this district, and Defendant City of Chicago is located within this district.

## STATEMENT OF FACTS

1. For decades, besides public transportation such as buses and trains, taxicabs were the dominant form of paid automobile transportation in the City of Chicago and throughout the United States. Beginning around 2016, however, Uber Technologies, Inc. ("Uber") effectively destroyed the traditional taxi industry, not only in Chicago, but in cities and states across the nation. Today, Uber and its sole major competitor, Lyft, Inc. ("Lyft"), are the two primary providers of on-demand, for-hire automobile transportation in the City of Chicago; traditional taxicabs have been largely driven from the market and are rarely seen on the streets, let alone patronized.

2. Uber operates a ride-sharing platform that connects passengers with drivers through a smartphone application. Uber provides the software platform, while drivers supply their own personal vehicles, bear all costs of vehicle maintenance and fuel, and provide the actual driving labor that generates revenue on the platform. Uber classifies its drivers as independent contractors. Despite the significant investment drivers make to operate on the platform, Uber retains unilateral authority to deactivate a driver's account, effectively terminating their ability to earn income.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

3. On or about September 1, 2023, Uber began aggressively recruiting Plaintiff to drive for their platform by sending multiple emails encouraging Plaintiff to drive.

4. After responding to their recruitment, Plaintiff began driving for Uber. Uber continued to encourage Plaintiff by sending bonus offers.

5. On or about February 16, 2024, Plaintiff purchased a 2024 Honda Accord specifically for driving for Uber, with monthly costs of $453.50 for the loan and $197 for insurance.

6. Sometime after February 16, 2024, Plaintiff also signed up to drive for the Lyft ride-sharing platform.

7. Shortly after beginning to drive for Uber, Plaintiff experienced several bizarre incidents. On one occasion while driving for Uber, Plaintiff picked up two female passengers, one of whom was inappropriately dressed. It appeared as if she was wearing a small leather jacket which was unzipped, revealing that she was only wearing a bra underneath, and she was wearing a pair of shorts that was barely there. They insisted on making a stop and yelled at Plaintiff when Plaintiff asked them to enter it into the app. Against Plaintiff's better judgment, Plaintiff agreed to drive them, but they had Plaintiff drive around aimlessly for 30 minutes. Eventually, Plaintiff insisted they pick a final destination, at which point they chose to exit the car while continuing to yell and scream at Plaintiff.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

8. On February 26, 2024, Plaintiff's Uber account was suspended following a complaint from Rider 1. Plaintiff was not provided with details about the complaint, and Plaintiff's account was reactivated after an investigation.

9. On March 13, 2024, Rider 2 threatened to make a false report alleging attempted rape after Plaintiff accidentally canceled her ride while driving for Uber. This incident led to the suspension of Plaintiff's Uber account the following day. Plaintiff's account was eventually reactivated about a month later, but Plaintiff was warned that further complaints could lead to permanent deactivation.

10. On June 2, 2024, after interactions with Riders 3, 4, and 5, Plaintiff's account was permanently deactivated, citing violations of community guidelines, though Plaintiff was not provided with details of the specific complaints made against Plaintiff.

11. Sometime after March 13, 2024, Plaintiff also began receiving false complaints while driving for Lyft. For example, Plaintiff's Lyft account was temporarily deactivated when one rider falsely reported that Plaintiff was driving while drinking alcohol. This complaint was inherently false because Plaintiff has a medical condition which prevents Plaintiff from consuming alcohol. Plaintiff's account was reactivated after an investigation. Sometime after this, Plaintiff's Lyft account was temporarily deactivated after a false report that Plaintiff was smoking marijuana while driving. Plaintiff's account was reactivated after an investigation.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

12. Shortly after the permanent deactivation of Plaintiff's Uber account, Plaintiff's Lyft account was also permanently deactivated following several complaints. Plaintiff reached out to Lyft requesting details and evidence supporting the deactivation; however, Lyft refused to provide any information and maintained the permanent deactivation of Plaintiff's account.

13. On August 21, 2024, Plaintiff discovered an earlier communication from Uber indicating that Plaintiff's account was canceled due to "multiple reports of identity concerns." Although the communication claimed that multiple emails had been sent to Plaintiff regarding these concerns, Plaintiff never received any such prior communications. (See Exhibit A).

14. On September 6, 2024, Plaintiff filed a complaint in the Circuit Court of Cook County, Illinois (Case No. 2024L009884) seeking to identify the riders who made complaints against Plaintiff on the Uber platform and obtain the details of those complaints.

15. On or around October 8, 2024, Uber reactivated Plaintiff's account and offered a small settlement to Plaintiff if Plaintiff dismissed Plaintiff's case. Plaintiff ultimately refused to accept Uber's settlement offer, primarily because it was inadequate, and more importantly, because it would not address the underlying problem of the false complaints. Plaintiff believed that accepting the offer would not prevent Plaintiff's account from being deactivated due to future false complaints.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

16. Plaintiff continued to drive on the reactivated account and began to experience more bizarre rider incidents while driving for Uber. For example, Plaintiff pulled up to pick up a female passenger who was underdressed. The passenger was wearing a jacket with a revealing shirt and extremely short shorts. The passenger made several attempts to engage Plaintiff with sexualized conversation, saying things like, "Oh, I can feel the breeze blowing on my cheeks." However, Plaintiff did not engage in the conversation.

17. Another bizarre incident occurred when Plaintiff picked up another female passenger. As Plaintiff can recall, the passenger had a bizarre account name which was something similar to "Letsfuck."

18. On July 1, 2025, Plaintiff amended the complaint to a Verified Petition for Pre-Suit Discovery Under Illinois Supreme Court Rule 224, seeking solely to ascertain the identities of unknown individuals who lodged false or malicious complaints against Plaintiff on the Uber platform.

19. Around February 20, 2025, Plaintiff began receiving a surge of unsafe driving complaints on the Uber platform. Plaintiff was notified of these complaints but was not provided sufficient detail to meaningfully respond to or dispute them, nor was Plaintiff informed of the identity of the complainants. These complaints resulted in Plaintiff's account being deactivated a second time on March 9, 2025.

20. On March 12, 2025, the court issued an order granting limited discovery and ordering Uber to identify the riders and provide complaint details.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

21. On March 19, 2025, Uber identified three riders: Rickia Williams, Markena Kellar, and Amber Fredrikson, and provided their respective complaints. However, the complaints contained no supporting evidence, corroboration, or documentation substantiating the allegations against Plaintiff. Furthermore, Uber only provided a home address for Markena Kellar. No home addresses were provided for Rickia Williams or Amber Fredrikson, making it impossible for Plaintiff to effectuate service upon them. (See Exhibit B).

22. Notably, Amber Fredrikson's complaint did not result in Plaintiff's first deactivation but instead contributed to Plaintiff's second deactivation. Despite the absence of any corroborating evidence, and despite Uber's failure to provide a verifiable address for this complainant, Uber relied on this unsubstantiated complaint to conclude that Plaintiff had performed illegal traffic maneuvers. Plaintiff possesses dashcam video of the trip in question, which demonstrates that no illegal traffic maneuvers occurred. (See Exhibit B).

23. Rickia Williams made the most serious allegation against Plaintiff on March 14, 2024, on the Uber platform, claiming "Driver tried to rape me and put me out under the vacant lot," which Uber treated as a safety incident involving attempted sexual assault. Despite the severity of this allegation, Uber failed to provide an address for Ms. Williams.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

24. Uber also denied that any riders submitted complaints related to “identity concerns” despite Uber’s prior communication to Plaintiff stating that Plaintiff’s account was canceled due to “multiple reports of identity concerns.”

25. On September 3, 2025, Plaintiff’s state court complaint was dismissed because Illinois law provides that a pre-discovery lawsuit is satisfied when one individual has been identified. In this case, Uber revealed the identity of one individual.

26. Both Uber’s and Lyft’s complaint processes do not provide the driver with the full details of the allegations against them. Drivers are not able to examine any evidence submitted against them, and they do not get a chance to question adverse witnesses.

27. Plaintiff relied on both his Uber and Lyft accounts as his primary source of income, and the deactivation of these accounts has caused Plaintiff to suffer extreme financial hardship.

28. As a result of the deactivations, Plaintiff continues to incur monthly costs of $453.50 for the car loan and $197 for insurance, totaling $650.50 per month, for a vehicle purchased specifically for ride-share driving. Plaintiff has lost substantial income from being unable to work on either platform. This financial harm compounds daily and will result in repossession of the vehicle, destruction of Plaintiff’s credit, and irreversible economic damage if not immediately remedied.

29. Despite the severity of the allegations against Plaintiff, including a claim of attempted rape, Uber has refused to provide complete contact information for the

accusers. Without addresses for Rickia Williams and Amber Fredrikson, Plaintiff cannot investigate the claims, serve discovery, take depositions, or effectively defend against the defamatory accusations in arbitration or any other forum. This renders the arbitration process futile and deprives Plaintiff of any meaningful ability to clear Plaintiff's name.

30. On August 10, 2020, the City of Chicago, through the Commissioner of the Department of Business Affairs and Consumer Protection, enacted rules regarding Transportation Network Providers ("TNPs"), pursuant to Chapter 9-115 of the Municipal Code of Chicago (the "TNP Ordinance").

31. The TNP Ordinance is a comprehensive set of rules which govern the conduct and relationship of TNPs (ride share companies like Uber and Lyft) within the City of Chicago. There are only two major TNPs in the Chicagoland area: Uber and Lyft.

32. Specifically, Rule TNP 1.10 requires TNPs to notify the City of Chicago of any driver deactivation along with providing at least one reason amongst the listed reasons for deactivation.

33. The TNP Ordinance permits TNPs like Uber and Lyft to permanently deactivate their drivers from the TNP's platform due to any conduct that gives "rise to a public safety concern." A "public safety concern" may be based on a mere "allegation or complaint" of things such as sexual misconduct, traffic incidents, assault/battery, driving under the influence of drugs and alcohol, etc., as well as just generically any "conduct

that gave rise to a public safety concern not itemized above in this section." See Rule TNP 1.10.

34. The TNP Ordinance effectively allows the City of Chicago to compile and maintain a record of deactivated drivers without providing procedural safeguards, leaving drivers vulnerable to adverse consequences without due process.

35. Plaintiff, as a driver for a TNP, was subject to the TNP Ordinance, which resulted in Plaintiff's deactivation being reported to the City of Chicago without notice or an opportunity to contest the decision.

36. Upon information and belief, Uber disclosed to both the City of Chicago and Lyft, and/or the City of Chicago disclosed to Lyft, that Plaintiff had been deactivated from the Uber platform for an alleged "public safety concern." As a result, Lyft deactivated Plaintiff's account shortly after Uber's deactivation, without conducting any independent investigation and without providing Plaintiff an opportunity to respond to or contest the allegations.

37. As a result of the actions of Uber, Lyft, and the City of Chicago's TNP Ordinance, Plaintiff has been unable to earn a living as a rideshare driver on any platform in the City of Chicago.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT I

## REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

**(Account Reactivation Pending Arbitration)**

38. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

39. Plaintiff acknowledges that his agreement with Uber Technologies, Inc. contains an arbitration clause. Plaintiff has initiated, or will imminently initiate, arbitration proceedings with Uber pursuant to that agreement. This Count does not seek final adjudication of the merits of Plaintiff's claims against Uber, but rather seeks interim injunctive relief from this Court to preserve the status quo and prevent irreparable harm while arbitration proceedings are pending.

### Legal Authority for Injunctive Relief Pending Arbitration

40. It is well established that the existence of an arbitration agreement does not divest a court of its equitable power to grant preliminary injunctive relief to preserve the status quo pending arbitration. The overwhelming majority of federal circuits have held that refusing such relief would undermine the very purpose of arbitration by allowing one party to suffer irreversible harm before an arbitrator can act.

41. In Teradyne, Inc. v. Mostek Corp., 797 F.2d 43 (1st Cir. 1986), the United States Court of Appeals for the First Circuit held that "the congressional desire to enforce

arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, ipso facto, the meaningfulness of the arbitration process."

42. Similarly, in Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373 (6th Cir. 1995), the United States Court of Appeals for the Sixth Circuit held that a preliminary injunction is particularly appropriate "where the withholding of injunctive relief would render the process of arbitration meaningless or a hollow formality because an arbitral award, at the time it was rendered, could not return the parties substantially to the status quo ante."

43. Both holdings apply squarely to Plaintiff's circumstances. If this Court does not grant interim relief, Plaintiff's financial ruin will be complete long before an arbitrator issues a final award. No monetary award rendered months or years from now can undo the repossession of Plaintiff's vehicle, the destruction of his credit, or the cascading economic collapse that is already underway. Without interim relief, arbitration becomes a hollow formality.

**Factual Basis for Injunctive Relief**

***A. Plaintiff's Significant Investment in the Uber Platform***

44. Plaintiff made a substantial financial investment in reliance on continued access to Uber's platform. On February 16, 2024, Plaintiff purchased a 2024 Honda Accord specifically for the purpose of driving for Uber, incurring monthly obligations of

$453.50 for the vehicle loan and $197 for insurance. In addition to providing the vehicle, Plaintiff bears all costs of fuel and maintenance, and provides the actual labor of driving. Uber's sole contribution to this arrangement is the software platform. Plaintiff's livelihood depends entirely on continued access to that platform.

***B. A Pattern of False and Baseless Complaints, Made Without Due Process***

45. From the outset, Plaintiff's Uber account has been subjected to a pattern of false and baseless complaints. Critically, at no point before deactivating Plaintiff's account did Uber provide Plaintiff with the specific details of the complaints lodged against him. Instead, Plaintiff received only vague notifications stating, in substance, that his "actions caused a rider to feel uncomfortable" and that, "as a result, your account is being deactivated." Plaintiff was never given an opportunity to review any evidence against him, examine any witness testimony, or meaningfully respond to the allegations before his account was deactivated.

46. Among the complaints used to justify deactivation was an allegation by Rickia Williams on March 14, 2024, claiming that Plaintiff "tried to rape" her. This allegation was patently false. No evidence was ever produced to support it. No law enforcement investigation was initiated. Uber nonetheless treated this unsubstantiated accusation as grounds for suspending Plaintiff's account. (See Exhibit B).

47. Another complaint, by Markena Kellar on June 1, 2024, arose from Plaintiff's refusal to provide unpaid services, specifically to make an additional stop that the rider did not enter into the Uber application. When Plaintiff asked the rider to enter the stop

through the app, as required by Uber's own policies, the rider filed a complaint claiming Plaintiff was "rude." This complaint was nonsensical on its face: the rider's own follow-up message to Uber stated, "Why 5 dollars I need more he was very rude," revealing that the complaint was motivated by a desire for a larger refund rather than any genuine safety or conduct concern. (See Exhibit B).

### *C. Uber's Shifting and Contradictory Rationales for Deactivation*

48. When Plaintiff challenged the basis for his first deactivation, Uber did not stand behind the original complaints. Instead, Uber introduced an entirely new rationale, informing Plaintiff that his account was canceled due to "multiple reports of identity concerns." (See Exhibit A). Yet when Plaintiff later demanded, through court-ordered discovery, that Uber identify the individuals who made these "identity concern" complaints, Uber responded under oath that no such complaints existed, directly contradicting its own prior communication to Plaintiff. This contradiction demonstrates that Uber manufactured a pretextual basis for deactivation and is willing to provide shifting, inconsistent explanations to justify its actions.

### *D. Retaliation Following Plaintiff's Refusal to Settle and Continuation of Legal Action*

49. After Plaintiff filed a legal complaint seeking to identify his accusers, Uber reactivated Plaintiff's account and offered a monetary settlement conditioned on dismissal of the case. Plaintiff refused the offer because it was inadequate and, more

importantly, because it would not prevent future deactivations based on the same kind of unsubstantiated complaints.

50. Following Plaintiff's refusal to settle, Plaintiff alleges that he was subjected to a series of suspicious encounters designed to manufacture grounds for deactivation. Multiple riders engaged in provocative and sexualized behavior toward Plaintiff, including passengers who were inappropriately dressed and who attempted to engage Plaintiff in sexual conversation. One rider used a sexually explicit account name. Plaintiff did not engage with any of these provocations and conducted himself professionally at all times. Plaintiff alleges that these encounters were calculated attempts to entrap him into conduct that could be characterized as sexual impropriety, thereby providing a basis for permanent deactivation.

51. When these apparent entrapment attempts failed to produce the desired result, Plaintiff was suddenly flooded with complaints alleging "dangerous driving." Beginning around February 20, 2025, Plaintiff received a surge of unsafe driving complaints. Based on these complaints, Uber concluded that Plaintiff was "performing illegal traffic maneuvers," despite the fact that no evidence whatsoever was submitted to support such a conclusion. Uber drew this finding based solely on the unverified, uncorroborated word of anonymous complainants. Once again, Plaintiff was not provided with sufficient details to meaningfully respond to or dispute the complaints. His account was permanently deactivated a second time on March 9, 2025.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

52. Plaintiff can affirmatively disprove at least one of the dangerous driving complaints. Amber Fredrikson's complaint, in which she alleged that Plaintiff drove erratically and behind a parked car and upon which Uber based its conclusion that Plaintiff was performing illegal traffic maneuvers, is directly contradicted by dashcam video of the trip in question. The video shows no illegal traffic maneuvers of any kind. Yet Uber relied on this uncorroborated complaint, without reviewing any evidence, to draw a finding of illegal conduct and use it as a basis for deactivation. (See Exhibit B).

53. Moreover, Plaintiff has maintained dashcam video recordings of all trips following the first deactivation of his account. Plaintiff is prepared to demonstrate that the dangerous driving complaints are false. However, Plaintiff cannot fully rebut each complaint because Uber has refused to provide the specific details of what Plaintiff is alleged to have done, on which trips, or by which riders. Plaintiff possesses the evidence to clear his name but has been denied the information necessary to match that evidence to the accusations, a circumstance that underscores the fundamental unfairness of Uber's complaint and deactivation process.

***E. Missing Addresses, Phantom Complainants, and Obstruction of Plaintiff's Defense***

54. After investing considerable time and resources pursuing this matter through legal channels, Plaintiff obtained a court order directing Uber to identify the complainants and provide their details. Uber identified three individuals but failed to provide home addresses for two of the three: Rickia Williams and Amber Fredrikson.

Confirming a home address is one of the most basic steps in taking a complaint and verifying a complainant's identity. The absence of home addresses for two out of three complainants raises serious questions about whether these individuals are real, locatable persons or whether the complaints were fabricated.

55. Even more troubling, when Plaintiff requested the identities of the individuals who made the "identity concern" complaints, the very complaints Uber itself cited as a reason for deactivation, Uber claimed under oath that no such complaints were ever made. This is directly contradicted by Uber's own written communication to Plaintiff. (See Exhibit A). This contradiction, combined with the missing addresses, strongly suggests that Uber has either fabricated complaints or is actively concealing the identities of complainants to prevent Plaintiff from mounting an effective defense.

***F. Fundamental Due Process Violations***

56. Throughout this entire course of events, Plaintiff has been denied the most basic procedural protections that any fair system must provide. Plaintiff was never given the specific details of the complaints against him before his account was deactivated. Plaintiff was never given the opportunity to review any evidence submitted against him. Plaintiff was never given the opportunity to examine or cross-examine the witnesses whose complaints formed the basis for deactivation. Plaintiff was never afforded any hearing or meaningful opportunity to respond before his livelihood was terminated. These are fundamental due process violations that are not tolerated in a modern American society, regardless of whether they occur in a public or private forum.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**Application of the Preliminary Injunction Standard**

57. Under the standard set forth in Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008), a preliminary injunction is warranted where the movant demonstrates: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. All four factors are satisfied here.

***1. Likelihood of Success on the Merits***

58. Plaintiff is likely to succeed on the merits of his underlying claims. The record demonstrates that Uber deactivated Plaintiff's account based on anonymous, unverified complaints, without providing Plaintiff any meaningful details, evidence, or opportunity to respond. Uber's own conduct reveals a pattern of shifting rationales: first citing rider complaints, then "identity concerns," then denying those same "identity concerns" ever existed. Uber reactivated Plaintiff's account after he filed suit, offered a settlement, and then deactivated him again when he refused. The most serious complaint, an allegation of attempted rape, was never corroborated by any evidence, and Uber cannot even produce a verifiable address for the accuser. Furthermore, Plaintiff possesses dashcam video that will disprove the allegations against him, and has video recordings of all trips following the first deactivation. These facts give rise to strong claims for breach of the implied covenant of good faith and fair dealing, breach of contract, and tortious interference with Plaintiff's economic interests.

***2. Irreparable Harm***

59. Plaintiff is suffering ongoing, compounding, and irreparable harm with each day that his account remains deactivated. Plaintiff continues to incur $453.50 per month for a vehicle loan and $197 per month for insurance, totaling $650.50 per month, on a vehicle purchased specifically for ride-share driving, while earning no income from the platform. This financial harm is not merely theoretical; it is compounding daily and will imminently result in repossession of the vehicle, destruction of Plaintiff's credit, and cascading economic damage that cannot be made whole by a future monetary award. The loss of Plaintiff's sole source of income, combined with the continuing obligations on a vehicle that serves no other purpose, constitutes the type of irreparable harm that equity is designed to prevent.

***3. Balance of Equities***

60. The balance of equities tips decidedly in Plaintiff's favor. On one side of the scale is the total loss of Plaintiff's livelihood, the imminent repossession of his vehicle, and the destruction of his financial life. On the other side is the negligible burden to Uber, a multi-billion-dollar corporation, of permitting one additional driver to operate temporarily on its platform while arbitration proceeds. Uber will suffer no cognizable harm from Plaintiff's continued operation. Plaintiff, by contrast, faces financial ruin without relief.

***4. Public Interest***

61. The public interest is served by granting injunctive relief. The public has a strong interest in ensuring that the arbitration process functions meaningfully and that

parties are not permitted to inflict irreversible harm on their opponents while arbitration is pending. Moreover, the public has an interest in ensuring that gig economy workers, who invest their own capital, maintain their own vehicles, and bear all operational costs, are not deprived of their livelihoods on the basis of secret, unverified accusations with no opportunity to be heard. A system in which a worker's income can be extinguished overnight based on anonymous complaints, without any disclosure of evidence or opportunity to respond, offends fundamental principles of fairness that the public has a direct interest in maintaining.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court enter a preliminary injunction providing the following relief:

a. Ordering Uber Technologies, Inc. to immediately reactivate Plaintiff's account so that Plaintiff may resume earning income and obtain relief from the ongoing financial devastation being inflicted upon him;

b. Ordering that Uber Technologies, Inc. shall not deactivate Plaintiff's account again unless Uber first presents to this Court a showing of good cause that such deactivation is justified, supported by specific evidence, and that Plaintiff has been afforded an opportunity to respond to the allegations, at least until arbitration proceedings have been completed;

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

c. Ordering that, prior to any future deactivation of Plaintiff's account, Uber shall provide Plaintiff with the specific details of any complaint, the identity and contact information of the complainant, and any evidence supporting the complaint, and shall afford Plaintiff a reasonable opportunity to respond before any adverse action is taken;

d. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT II

## DECLARATORY JUDGMENT: UNCONSCIONABILITY OF ARBITRATION AGREEMENT

62. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

63. Plaintiff seeks a declaratory judgment that the arbitration clause contained in Uber's Terms of Service is unconscionable and unenforceable as applied to Plaintiff's claims. The United States Supreme Court has expressly held that Section 2 of the Federal Arbitration Act permits arbitration agreements to be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687 (1996). Unconscionability is therefore a recognized ground for refusing to enforce an arbitration clause, provided the challenge is grounded in generally applicable state contract law rather than a rule that singles out arbitration for disfavored treatment.

64. Under Illinois law, unconscionability is assessed on a sliding scale: the more procedurally unconscionable a contract is, the less substantively unconscionable it need be to warrant invalidation, and vice versa. Razor v. Hyundai Motor America, 222 Ill. 2d 75, 99 (2006). A contract or clause is unconscionable when it is "so one-sided as to oppress or unfairly surprise an innocent party" or where "there is an absence of meaningful choice on the part of one of the parties together with contract terms which are

unreasonably favorable to the other party." Id. As set forth below, Uber's arbitration clause is both procedurally and substantively unconscionable under this standard.

***A. Uber's Destruction of the Taxi Industry and Dominance of the Rideshare Market***

65. As set forth above, Uber has effectively destroyed the traditional taxi industry. What was once the dominant form of paid automobile transportation has been reduced to near extinction. According to publicly available market data, Uber commands approximately 70% of the United States rideshare market. Its sole significant competitor, Lyft, holds the substantial majority of the remainder. No other rideshare company holds a meaningful share of the market. There are other rideshare companies in existence, but the reality is that none of them commands a significant portion of the rideshare market. The average consumer does not even consider calling a taxi service, and the average individual seeking to drive for hire would not consider working for a taxi company, as the widespread perception, grounded in economic reality, is that taxi driving is no longer a viable livelihood. In fact, some taxi drivers now receive a portion of their business through the Uber application itself.

66. The practical result of Uber's market dominance is that any individual who wishes to earn a living as a for-hire driver has, at most, two options: Uber or Lyft. There is no meaningful alternative. A driver who is deactivated from both platforms, as Plaintiff has been, is effectively excluded from the entire industry.

***B. Procedural Unconscionability***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

67. Uber’s arbitration clause is procedurally unconscionable. The agreement is a classic contract of adhesion: a standardized form drafted entirely by Uber and presented to drivers on a take-it-or-leave-it basis through a digital click-through interface on a smartphone application. Drivers have no ability to negotiate any terms of the agreement, including the arbitration clause. The Illinois Supreme Court has recognized that such standardized, non-negotiable agreements are hallmarks of procedural unconscionability, particularly where the adhering party has no meaningful alternative but to accept the terms imposed. Kinkel v. Cingular Wireless LLC, 223 Ill. 2d 1, 22 (2006); see also Bess v. DirecTV, Inc., 381 Ill. App. 3d 229 (2008) (considering the manner of presentation and element of surprise in assessing procedural unconscionability). Here, the absence of meaningful choice is even more pronounced than in Kinkel, where the consumer could at least choose a different wireless provider. Given that Uber and Lyft together constitute the entire viable rideshare market, a driver who refuses to accept Uber’s terms does not merely forgo one employment opportunity. The driver forfeits access to the dominant platform in the only industry available to him. The extreme inequality of bargaining power between a multi-billion-dollar corporation and an individual driver, combined with the absence of any meaningful market alternative, renders the formation of this contract procedurally unconscionable.

***C. Substantive Unconscionability: Uber’s System Is Designed to Deny Drivers Any Ability to Defend Themselves***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

68. Uber's arbitration clause is substantively unconscionable because Uber has constructed an entire operational system that ensures a driver can never mount a meaningful defense against false complaints, whether in arbitration, in court, or in any other forum. The clause purports to channel all disputes into arbitration while Uber simultaneously ensures that the arbitration process cannot function fairly.

69. First, Uber does not provide drivers with the actual details of complaints made against them. When a complaint is filed, the driver receives only generic notifications such as "your actions have made a rider uncomfortable" or that the driver's conduct violated "community guidelines." The driver is never told what specifically he is alleged to have done, when, or to whom.

70. Second, Uber does not allow drivers to review the statements or evidence submitted against them. The driver is deactivated based on allegations he has never seen and cannot examine.

71. Third, Uber does not allow drivers to question or confront the individuals who made the complaints. The driver has no opportunity to cross-examine his accusers, challenge their credibility, or present contradictory evidence before the deactivation occurs.

72. Fourth, a single unverified complaint, even one as demonstrably false as "Driver tried to rape me," is sufficient to trigger the permanent deactivation of a driver's account, without any investigation, corroboration, or opportunity for the driver to

respond. The complaint need not be supported by any evidence whatsoever. In some cases, a rider's complaint may be nothing more than a statement that the driver was "rude," motivated by a desire for a refund rather than any genuine safety concern, and this alone is sufficient to trigger permanent deactivation. (See Exhibit B).

73. Fifth, once a driver is deactivated from Uber, the deactivation is reported to the City of Chicago pursuant to the TNP Ordinance, and upon information and belief, this information is transmitted to Lyft, resulting in the driver's deactivation from both platforms. A single anonymous, unverified complaint on one platform can thus result in the driver's total exclusion from the entire rideshare industry, with no avenue for recourse.

***D. Uber Weaponizes the Arbitration Clause While Ensuring the Driver Cannot Obtain the Information Necessary to Arbitrate***

74. When Plaintiff attempted to seek justice through the legal system by filing a lawsuit to identify the individuals who made false complaints against him, Uber fought vigorously to prevent Plaintiff from obtaining the personal identifying information of the complainants. Plaintiff spent months of his own time, money, and energy litigating against Uber merely to learn the names of the individuals who had accused him. When a state court finally ordered Uber to disclose this information, Uber provided incomplete information: names without addresses for two of three complainants, and a sworn denial that certain complaints, which Uber itself had previously cited as a basis for deactivation, had ever been made.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

75. The result is that Plaintiff has been left with fragments of information, pieces of a puzzle that require further expenditure of time, money, and energy to assemble, before Plaintiff can even begin to defend himself against the accusations that destroyed his livelihood. The arbitration clause requires Plaintiff to arbitrate his claims, but Uber has ensured that Plaintiff lacks the most basic information necessary to do so effectively. Confirming a home address is one of the most basic elements of taking a complaint and verifying a complainant's identity. Uber's failure to obtain or provide this information for two of three complainants renders the arbitration process a futile exercise.

***E. The Arbitration Process Itself Is Structured to Favor Uber***

76. Even if Plaintiff were able to overcome the informational barriers Uber has erected, the arbitration process itself is fundamentally tilted in Uber's favor. Arbitration proceedings are private: the public will never learn the outcome, and Uber is free to continue the same practices against other drivers without public scrutiny or accountability. Uber is a repeat player in arbitration, appearing in thousands of proceedings with institutional knowledge, dedicated legal teams, and established relationships with arbitration providers. The individual driver appears once, pro se, with no comparable resources or experience.

77. Moreover, Uber ensures that the driver cannot earn income through its platform while arbitration is pending. The driver is thus placed in the untenable position of pursuing a lengthy arbitration process, at his own expense and against a multi-billion-dollar corporation with incomplete information about the claims against him, while

simultaneously suffering the ongoing financial devastation of having no income. The Seventh Circuit has recognized that an arbitration clause is unenforceable where the designated dispute-resolution mechanism is structured in a way that renders it practically unavailable to the aggrieved party. Jackson v. Payday Financial, LLC, 764 F.3d 765 (7th Cir. 2014). That is precisely the case here: Uber's arbitration clause imposes structural barriers — withholding the identity of accusers, withholding the evidence relied upon, withholding the specific allegations against the driver, and cutting off the driver's income during any proceeding — that make meaningful arbitration practically impossible. Uber's arbitration clause does not provide a meaningful forum for the resolution of disputes; it functions as a mechanism for ensuring that drivers cannot effectively challenge Uber's actions.

***F. These Practices Shock the Conscience***

78. Taken together, Uber's practices constitute a system that shocks the conscience. Uber has destroyed the traditional taxi industry, established a dominant market position, and then imposed take-it-or-leave-it contracts on the very drivers who supply the vehicles, fuel, maintenance, and labor that make Uber's business model possible. Uber reserves the unilateral right to terminate a driver's livelihood based on anonymous, unverified complaints, without providing any details, evidence, or opportunity to respond. When drivers attempt to seek justice, Uber invokes an arbitration clause that it has rendered meaningless by withholding the information necessary to arbitrate. And while the driver waits for the arbitration process to run its course, Uber

ensures that the driver earns nothing, compounding the very harm the driver seeks to remedy.

79. A contract provision that channels all disputes into a forum that the drafting party has deliberately rendered ineffective is unconscionable. As the Illinois Supreme Court has recognized, unconscionability may be found where a contract is "so one-sided as to oppress or unfairly surprise an innocent party," Razor, 222 Ill. 2d at 99, particularly where the agreement is a contract of adhesion imposed without meaningful choice, Kinkel, 223 Ill. 2d at 22. The arbitration clause in Uber's Terms of Service is unconscionable both in the manner of its formation, as a take-it-or-leave-it digital contract imposed by a market-dominant corporation that controls access to the only viable industry, and in its operation as a system deliberately designed to deny the driver the information and resources necessary to mount any meaningful defense. This Court should declare the arbitration clause unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court enter a declaratory judgment providing the following relief:

a. Declaring that the arbitration clause contained in Uber Technologies, Inc.'s Terms of Service is unconscionable and unenforceable as applied to Plaintiff's claims;

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

b. Declaring that Plaintiff is entitled to pursue his claims against Uber Technologies, Inc. in this Court rather than through arbitration;

c. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT III

## VIOLATION OF FEDERAL AND STATE ANTITRUST LAW

**(Sherman Act, 15 U.S.C. §§ 1–2; Illinois Antitrust Act, 740 ILCS 10/)**

80. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

### *A. The Relevant Market*

81. The relevant product market is the market for on-demand, for-hire automobile transportation services, commonly known as "rideshare" services. This market is distinct from traditional taxi services, public transportation, and private vehicle ownership. Rideshare services are characterized by the use of smartphone applications to connect passengers with drivers in real time, with automated fare calculation, cashless payment, and driver/rider rating systems. The relevant geographic market is the City of Chicago and the surrounding Chicagoland metropolitan area.

82. As set forth above, Uber has effectively destroyed the traditional taxi industry. The rideshare market in the City of Chicago is dominated by two companies: Uber and Lyft. No other rideshare company holds a meaningful share of this market. According to publicly available market data, Uber alone commands approximately 70% of the national rideshare market, with Lyft holding the substantial majority of the remainder. Together, Uber and Lyft constitute a duopoly that controls virtually the entire market for on-demand, for-hire automobile transportation in the City of Chicago.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

83. Barriers to entry in the rideshare market are exceptionally high. A new entrant would need to develop a sophisticated technology platform, recruit a critical mass of both drivers and riders to make the service viable, comply with the City of Chicago's TNP Ordinance and related regulatory requirements, and overcome the powerful network effects that entrench Uber and Lyft as the default choices for both consumers and drivers. As a practical matter, no new competitor has successfully entered this market in years, and no existing competitor beyond Lyft holds a meaningful share.

***B. Uber's Monopoly Power***

84. Uber possesses monopoly power in the relevant market within the meaning of Section 2 of the Sherman Act, 15 U.S.C. § 2. With approximately 70% of the national rideshare market and a dominant share of the Chicago rideshare market, Uber has the power to control prices, exclude competition, and dictate the terms on which drivers may participate in the market. Uber's market power is further evidenced by its ability to impose take-it-or-leave-it contracts on drivers, unilaterally deactivate their accounts without meaningful process, and effectively bar them from the entire industry, all without any competitive constraint. The Supreme Court has established that monopolization under Section 2 requires proof of (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Both elements are satisfied here.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

85. Uber's monopoly power extends not only to the consumer-facing market for rides but also to the labor market for drivers. A driver who wishes to earn a living providing on-demand automobile transportation has, at most, two options: Uber or Lyft. There is no meaningful third alternative. The traditional taxi industry, which once provided such an alternative, has been decimated. The average individual seeking to drive for hire would not consider working for a taxi company because the widespread perception, grounded in economic reality, is that taxi driving is no longer a viable livelihood. The Supreme Court has confirmed that antitrust law applies to labor-market restraints, and that a dominant entity may not use its market power to suppress worker participation or exclude labor from the market. NCAA v. Alston, 594 U.S. 69 (2021). Uber's dominance over the driver labor market is therefore subject to the same antitrust scrutiny as its consumer-facing market power.

***C. Anticompetitive Conduct: Uber's Deactivation System as a Tool of Market Exclusion***

86. Uber has used its monopoly power to engage in anticompetitive conduct in violation of Section 2 of the Sherman Act. Specifically, Uber has constructed a deactivation system that operates not merely to remove individual drivers from Uber's own platform, but to permanently exclude them from the entire rideshare market. Through the operation of the TNP Ordinance, which requires Uber to report driver deactivations to the City of Chicago, and through the resulting transmission of that

information to Lyft, a single deactivation by Uber results in the driver's exclusion from both platforms and therefore from 100% of the viable rideshare market.

87. This system gives Uber the unilateral power to permanently exclude any driver from the entire industry based on nothing more than an anonymous, unverified complaint. No investigation is required. No evidence is needed. No opportunity to respond is given. The driver is not merely fired from one job. The driver is permanently barred from the only industry available to him. This is an exercise of monopoly power that goes far beyond the legitimate needs of Uber's business and constitutes anticompetitive conduct designed to maintain Uber's dominance over its driver workforce.

***D. Coordinated Exclusion with Lyft in Violation of Section 1 of the Sherman Act***

88. In addition to Uber's unilateral anticompetitive conduct, the mechanism by which driver deactivation information flows from Uber to the City of Chicago and then to Lyft constitutes a concerted action in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Supreme Court has long held that concerted refusals to deal among competitors, commonly known as group boycotts, constitute per se violations of Section 1. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959). Uber and Lyft are nominally competitors. Yet through the TNP Ordinance's reporting requirements and the City's role as an intermediary, these two competitors effectively maintain a shared blacklist of deactivated drivers.

89. The practical effect of this arrangement is that a driver deactivated by one company is automatically excluded from the other, without any independent investigation by the second company and without any opportunity for the driver to be heard. This coordinated exclusion mechanism ensures that the two dominant firms in the market act in concert to deny drivers access to the entire industry. Whether characterized as an agreement, a concerted action, or a conspiracy facilitated through a government intermediary, this conduct unreasonably restrains trade in the rideshare driver labor market.

### *E. Harm to Competition*

90. The anticompetitive conduct described herein harms competition in multiple ways. First, it reduces the supply of available drivers, harming consumers who depend on rideshare services. Second, it chills the exercise of driver rights: drivers who fear permanent market exclusion are deterred from asserting their legal rights, filing complaints, or challenging Uber's practices. Third, it eliminates competitive pressure on Uber to treat its drivers fairly, because drivers have no meaningful alternative to which they can turn. Fourth, it reinforces Uber's monopoly power by ensuring that drivers remain dependent on Uber's platform and subject to Uber's unilateral control.

### *F. Antitrust Injury to Plaintiff*

91. Plaintiff has suffered antitrust injury, meaning injury of the type the antitrust laws were intended to prevent, flowing from the anticompetitive aspects of Defendants' conduct. Plaintiff was permanently excluded from the entire rideshare market, the only

viable market for on-demand, for-hire automobile transportation, based on anonymous, unverified complaints, without due process, and without any ability to seek alternative employment in the industry. As a direct result, Plaintiff has lost his sole source of income, continues to incur $650.50 per month in vehicle costs for a car purchased specifically for rideshare driving, and faces imminent financial ruin. To establish antitrust standing, a plaintiff must demonstrate "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Plaintiff's total exclusion from the driver labor market, achieved through Uber's monopoly power and coordinated exclusion mechanism, constitutes precisely that type of injury. The same conduct gives rise to parallel claims under the Illinois Antitrust Act, 740 ILCS 10/. That Act expressly provides that it "shall be construed in conformity with the law of the United States in relation to monopolies and restraints of trade to the extent that the language of this Act permits." 740 ILCS 10/11. All federal antitrust violations alleged herein therefore constitute parallel violations of Illinois law.

92. Plaintiff's injuries are a direct and proximate result of Uber's monopoly power and anticompetitive conduct, and of the coordinated exclusion mechanism maintained by Uber and Lyft through the City of Chicago. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff is entitled to recover threefold the damages sustained as a result of the antitrust violations alleged herein, together with the costs of

this action and reasonable attorney's fees. Plaintiff is also entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court grant the following relief on Count III:

a. Declaring that Uber Technologies, Inc.'s conduct as described herein violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Illinois Antitrust Act, 740 ILCS 10/;

b. Declaring that the coordinated exclusion of drivers from the rideshare market through the mechanism described herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Illinois Antitrust Act, 740 ILCS 10/;

c. Ordering Uber Technologies, Inc. to cease and desist from using its deactivation system to permanently exclude drivers from the entire rideshare market without providing adequate procedural protections;

d. Awarding Plaintiff treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be proven at trial;

e. Awarding Plaintiff the costs of this action and reasonable attorney's fees pursuant to 15 U.S.C. § 15;

f. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT IV

## VIOLATION OF 42 U.S.C. § 1983

## DENIAL OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS

**(Fourteenth Amendment to the United States Constitution)**

**Against Defendant City of Chicago**

93. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

94. This Count is brought pursuant to 42 U.S.C. § 1983, which provides a cause of action against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution and laws of the United States. The City of Chicago, in enacting and enforcing Rule TNP 1.10 of the TNP Ordinance, acted and continues to act under color of state law.

95. Plaintiff has a protected property interest in his TNP chauffeur's license and in his ability to earn a living as a rideshare driver. Courts have long recognized that the right to pursue a chosen occupation and to earn a livelihood is a constitutionally protected liberty and property interest under the Fourteenth Amendment. Plaintiff obtained his TNP chauffeur's license and invested substantial resources, including the purchase of a 2024 Honda Accord at a monthly cost of $453.50, plus $197 per month in insurance, in direct reliance on his continued ability to work as a licensed rideshare driver. That license and

the economic opportunity it represents constitute a cognizable property interest protected by the Due Process Clause.

96. The City of Chicago's Rule TNP 1.10 requires TNPs such as Uber to report driver deactivations to the City of Chicago, including the reason for deactivation. Upon information and belief, pursuant to this reporting requirement, Uber reported Plaintiff's deactivation to the City of Chicago, and identified the reason as conduct giving rise to a "public safety concern." Upon information and belief, this report triggered adverse action affecting Plaintiff's TNP chauffeur's license status, and the City disclosed Plaintiff's deactivation status to Lyft. As a direct result, Lyft deactivated Plaintiff's account on or around June 12, 2024, less than two weeks after Uber's permanent deactivation of Plaintiff's account on June 2, 2024, without conducting any independent investigation and without providing Plaintiff any opportunity to be heard.

97. At no point before, during, or after this process did the City of Chicago provide Plaintiff with notice of the allegations against him, notice that a report had been made to the City, or any opportunity to contest the deactivation, challenge the underlying complaint, or present evidence on his own behalf. Plaintiff was deprived of his livelihood without any procedural safeguard whatsoever.

***A. Procedural Due Process Violations***

98. Procedural due process requires that the government provide notice and a meaningful opportunity to be heard before depriving a person of a protected property or liberty interest. Rule TNP 1.10 provides no such protections. The Ordinance permits

TNPs to report driver deactivations to the City, with potentially severe consequences for the driver's license status and ability to work, without requiring that the driver be notified of the report, informed of the underlying allegations, or afforded any opportunity to contest the deactivation before the City acts upon it.

99. The deactivation-and-reporting mechanism operated by the City of Chicago through Rule TNP 1.10 effectively bars drivers like Plaintiff from working for any TNP in the City of Chicago, based solely on an unverified complaint made to a private company, without any investigation by the City, without notice to the driver, and without any hearing or opportunity to be heard. This is a textbook violation of procedural due process under the Fourteenth Amendment.

100. Although Rule TNP 5.14 of the Ordinance provides a hearing mechanism for rescission of a TNP chauffeur's license, the City of Chicago has permitted TNPs such as Uber and Lyft to effectively rescind drivers' ability to work and to transmit deactivation information that causes immediate, industry-wide exclusion, without first triggering the administrative due process procedures required under the Ordinance. The result is that Plaintiff was deprived of the practical benefit of his license and his livelihood without ever receiving the procedural protections the Ordinance itself nominally provides.

***B. Substantive Due Process Violations***

101. Substantive due process protects individuals from government action that is arbitrary, capricious, or otherwise shocks the conscience, regardless of the procedural protections afforded. Rule TNP 1.10 is substantively unconstitutional because it

authorizes the permanent, industry-wide exclusion of a driver from his chosen occupation based on nothing more than a vague and unverified "allegation or complaint" of a "public safety concern." The rule does not require the City to investigate the underlying allegations, does not require the TNP to verify the complaint, and does not require any evidence whatsoever before the reporting mechanism is activated and the driver's livelihood is effectively destroyed.

102. The rule is overbroad and does not distinguish between serious, substantiated safety concerns, such as a verified DUI or a documented assault, and trivial or fabricated complaints, such as a rider's demand for a refund or a false allegation of sexual misconduct. Under Rule TNP 1.10, a driver can be permanently excluded from the entire rideshare industry based on a single complaint that is wholly uncorroborated, that the driver has never been shown, and that the driver has had no opportunity to challenge. This is precisely what happened to Plaintiff. Such arbitrary and disproportionate government action violates the substantive guarantees of the Fourteenth Amendment.

***C. Equal Protection: TNP Drivers Are Treated Differently Than Public Chauffeurs Without Rational Basis***

103. The City of Chicago's regulatory scheme treats TNP drivers, such as Plaintiff, fundamentally differently from Public Chauffeurs (taxi drivers) without any rational basis for the distinction. Both categories of workers perform substantially the same function: providing paid, for-hire automobile transportation to passengers in the City of Chicago. Yet the City's Public Chauffeur Rules provide taxi drivers with robust

procedural protections before any adverse action may be taken against their license, including the right to an investigation, notice, a hearing, and an appeal. See Rules CH 1.05(b), CH 2.01, CH 2.04(b), CH 5.09(a), CH 11.02.

104. By contrast, Rule TNP 1.10 affords TNP drivers none of these protections. A TNP driver can be permanently excluded from the entire rideshare industry, effectively stripped of his TNP chauffeur's license as a practical matter, based on a single unverified complaint, with no investigation, no notice, no hearing, and no appeal. The same City that mandates due process for taxi drivers has created a system that permits the complete deprivation of a TNP driver's livelihood without any process at all. This disparate treatment of similarly situated workers lacks any rational basis and violates the Equal Protection Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court enter judgment against Defendant City of Chicago on Count IV and grant the following relief:

a. Declaring that the City of Chicago's Rule TNP 1.10 is unconstitutional as applied to Plaintiff, in that its enforcement violated Plaintiff's rights to procedural due process, substantive due process, and equal protection under the Fourteenth Amendment to the United States Constitution;

b. Issuing a preliminary and permanent injunction prohibiting the City of Chicago from enforcing Rule TNP 1.10 in a manner that results in the deprivation

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

of a driver's livelihood without prior notice, an opportunity to be heard, and a meaningful opportunity to contest the underlying allegations;

c. Ordering the City of Chicago to take all steps necessary to notify Lyft and any other TNP that Plaintiff's deactivation report has been rescinded and that Plaintiff's TNP chauffeur's license is in good standing, so that Plaintiff may be reinstated on all platforms from which he was excluded as a result of the City's actions;

d. Awarding Plaintiff compensatory damages for lost income and financial harm suffered as a direct result of the City's unconstitutional actions, in an amount to be proven at trial;

e. Awarding Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

f. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT V

## NEGLIGENCE

**Against Defendant Lyft, Inc.**

105. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

106. As an operator of a transportation network platform, Lyft is in the business of supplying, receiving, processing, and acting upon information, specifically safety information about drivers and passengers transmitted through its platform. Lyft's core platform function includes receiving third-party safety reports, processing driver rating data, and making deactivation decisions based upon that information. As such, Lyft owed a duty of reasonable care to drivers, including Plaintiff, in the receipt, evaluation, and use of third-party information upon which permanent adverse actions are taken.

107. Specifically, when Lyft receives third-party safety reports, including, upon information and belief, reports transmitted through the City of Chicago's TNP Ordinance reporting mechanism and/or information originating from or through Uber, and acts upon such information to permanently deactivate a driver, it operates as a supplier of information within the meaning of Restatement (Second) of Torts § 552. Lyft therefore owed Plaintiff a duty to exercise reasonable care in obtaining, evaluating, and communicating the accuracy and reliability of such third-party reports before taking irreversible adverse action based upon them.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

108. Lyft breached this duty by deactivating Plaintiff's account on or around June 12, 2024, based on unverified and unsubstantiated information received from third parties, without exercising reasonable care in obtaining, evaluating, or communicating that information. Lyft did not provide Plaintiff with the specific details of the reports against him, did not provide any evidence supporting deactivation, and did not afford Plaintiff any meaningful opportunity to respond to or contest the allegations before his account was permanently deactivated.

109. While the Illinois economic loss doctrine generally limits negligence recovery to physical harm, see Moorman Mfg. Co. v. National Tank Co., 91 Ill. 2d 69 (1982), Moorman expressly recognizes an exception where a defendant is engaged in the business of supplying information and fails to exercise reasonable care in obtaining or communicating it. See Restatement (Second) of Torts § 552. Lyft's deactivation of Plaintiff, premised on unverified third-party safety data processed through its information platform, falls squarely within this exception.

110. As a direct and proximate result of Lyft's negligent reliance on unverified third-party information, Plaintiff was wrongfully deactivated from the Lyft platform, losing his ability to work as a rideshare driver and earn income. Plaintiff continues to incur $650.50 per month in vehicle costs for a vehicle purchased specifically for rideshare driving, while earning no income from the platform. Plaintiff has suffered substantial financial harm, lost income, and lost business opportunities as a direct and proximate result of Lyft's breach of its duty of reasonable care.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court enter judgment against Defendant Lyft, Inc. on Count V and grant the following relief:

a. Awarding Plaintiff compensatory damages for lost income, lost business opportunities, and all other financial harm suffered as a direct and proximate result of Lyft's negligence, in an amount to be proven at trial;

b. Awarding Plaintiff pre-judgment and post-judgment interest as allowed by law;

c. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT VI

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

**Against Defendant Lyft, Inc.**

111. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

112. Under Illinois law, a claim for tortious interference with prospective economic advantage requires: (1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of that expectancy; (3) purposeful interference by defendant; and (4) damages resulting from the interference. Fellhauer v. City of Geneva, 142 Ill. 2d 495, 511 (1991). Critically, even at-will business relationships and expectancies are entitled to this protection under Illinois law. Anderson v. Vanden Dorpel, 172 Ill. 2d 399 (1996). At all relevant times, Plaintiff had a reasonable expectation of continued economic advantage from his work as a rideshare driver on the Lyft platform. Plaintiff had validly registered as a Lyft driver, possessed an active TNP chauffeur's license, maintained a vehicle in good working order, and had a legitimate and reasonable expectation of continued income from driving on the Lyft platform.

113. Lyft had full knowledge of Plaintiff's business relationship with its platform and his reasonable expectation of continued economic advantage from that relationship.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

114. Upon information and belief, Lyft intentionally and without justification interfered with Plaintiff's prospective economic advantage by permanently deactivating his account on or around June 12, 2024, based solely on unverified third-party information, without conducting any independent investigation, without providing Plaintiff with the specific details of the allegations against him, without providing Plaintiff with any evidence supporting the deactivation, and without affording Plaintiff any meaningful opportunity to respond. Under Illinois law, interference accomplished through fraud, misrepresentation, or other improper conduct constitutes actionable tortious interference. Dowd & Dowd, Ltd. v. Gleason, 181 Ill. 2d 460 (1998). Lyft's reliance on unverified third-party allegations without any independent investigation constitutes such improper means. Furthermore, interference is actionable where it is intentional and unjustified, even where carried out under the guise of ordinary business conduct. Voyles v. Sandia Mortgage Corp., 196 Ill. 2d 288, 301 (2001). Lyft's conduct was unjustified and undertaken with knowledge that it would permanently deprive Plaintiff of his ability to earn income on its platform.

115. As a direct and proximate result of Lyft's interference, Plaintiff has been permanently excluded from the Lyft platform and deprived of all income he would otherwise have earned. Plaintiff continues to suffer ongoing financial harm in the amount of $650.50 per month in vehicle costs for a car purchased specifically for rideshare driving, while earning no income from the platform. This harm is compounding daily and will result in irreversible financial damage if not remedied.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court enter judgment against Defendant Lyft, Inc. on Count VI and grant the following relief:

a. Awarding Plaintiff compensatory damages for lost income and all financial harm suffered as a direct and proximate result of Lyft's tortious interference, in an amount to be proven at trial;

b. Awarding Plaintiff punitive damages for Lyft's intentional and unjustified interference with Plaintiff's prospective economic advantage;

c. Awarding Plaintiff pre-judgment and post-judgment interest as allowed by law;

d. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## COUNT VII

## DECLARATORY JUDGMENT: UNCONSCIONABILITY OF ARBITRATION AGREEMENT

### Against Defendant Lyft, Inc.

116. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

117. Plaintiff acknowledges that his agreement with Lyft, Inc. may contain an arbitration clause. Plaintiff has initiated, or will imminently initiate, arbitration proceedings with Lyft pursuant to that agreement. This Count does not seek final adjudication of the merits of Plaintiff's claims against Lyft, but rather seeks a declaratory judgment that the arbitration clause is unconscionable and unenforceable as applied to Plaintiff's claims.

118. To the extent that Lyft's Terms of Service contain an arbitration clause purporting to require Plaintiff to arbitrate his claims against Lyft, Plaintiff seeks a declaratory judgment that such clause is unconscionable and unenforceable as applied to Plaintiff's claims, for the same reasons set forth in Count II with respect to Uber's arbitration clause. The United States Supreme Court has expressly held that Section 2 of the Federal Arbitration Act permits arbitration agreements to be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687 (1996).

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

119. Lyft operates the second-largest rideshare platform in the United States and, together with Uber, constitutes the entirety of the viable rideshare market. Any arbitration clause in Lyft's Terms of Service is a contract of adhesion: a standardized form drafted entirely by Lyft and presented to drivers on a take-it-or-leave-it basis, with no ability to negotiate any terms. A driver who refuses Lyft's terms does not merely forgo one employment opportunity. He is foreclosed from the only remaining major rideshare platform available to him. The extreme inequality of bargaining power between a multi-billion-dollar corporation and an individual driver, combined with the absence of any meaningful market alternative, renders the formation of any such arbitration clause procedurally unconscionable.

120. Moreover, as set forth above, Lyft permanently deactivated Plaintiff's account without providing him with the specific details of the allegations against him, without providing any evidence supporting the deactivation, and without affording him any meaningful opportunity to respond. To the extent Lyft's arbitration clause purports to channel all disputes arising from this deactivation into arbitration, while Lyft has simultaneously ensured that Plaintiff lacks the information necessary to arbitrate effectively, the clause is substantively unconscionable. An arbitration clause that channels disputes into a forum that the drafting party has rendered ineffective by withholding necessary information is unconscionable under Illinois law. Razor v. Hyundai Motor America, 222 Ill. 2d 75, 99 (2006); Kinkel v. Cingular Wireless LLC, 223 Ill. 2d 1, 22 (2006).

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

121. Furthermore, the Seventh Circuit has recognized that an arbitration clause is unenforceable where the designated dispute-resolution mechanism is structured in a way that renders it practically unavailable to the aggrieved party. Jackson v. Payday Financial, LLC, 764 F.3d 765 (7th Cir. 2014). That is precisely the case here: Lyft's deactivation of Plaintiff without providing him the identities of accusers, the evidence relied upon, or the specific details of the allegations against him creates structural barriers that make any arbitration proceeding a futile exercise rather than a meaningful forum for the resolution of his claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Martin respectfully requests that this Court enter a declaratory judgment providing the following relief on Count VII:

a. Declaring that any arbitration clause contained in Lyft, Inc.'s Terms of Service is unconscionable and unenforceable as applied to Plaintiff's claims;

b. Declaring that Plaintiff is entitled to pursue his claims against Lyft, Inc. in this Court rather than through arbitration;

c. Granting such other and further relief as this Court deems just and equitable.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

## DEMAND FOR JURY TRIAL

Plaintiff David Martin hereby demands trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**VERIFICATION**

I, David Martin, declare under penalty of perjury under the laws of the United States of America that I am the Plaintiff in the above-captioned action, that I have read the foregoing Verified Complaint, and that the factual allegations therein are true and correct to the best of my knowledge, information, and belief.

Executed on: 3/3/26

David Martin
_______________________________
David Martin, Plaintiff Pro Se

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

3/3/26

Respectfully submitted,

David Martin

David Martin, Pro Se
5724 Kathryn Lane
Matteson, IL 60443
Phone: (773) 893-0813
Email: davidmartinlitigation@gmail.com

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

EXHIBIT A

Conversation

U

Select below to call agent.

Uber · 10 months ago

U

Call Support

Uber · 10 months ago

I

Hi DAVID.

Thank you for reaching out about your account.

Your account has been deactivated due to multiple reports of identity concerns.

You have received emails in the past about reports of this nature and have gone through the review process for this deactivation.

Due to these repeated reports, you no longer have access to Uber apps.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

EXHIBIT B

Rider information requested by David Martin

| Rider Name | Email | Cell | Last Known Address |
|---|---|---|---|
| **Rickia Williams** | rickia.williams@icloud.com | 3125768119 | Unknown |
| **Markena Kellar** | markenakellar18@gmail.com | 7733683986 | 1606 Madison Street, Apt. 2<br>Maywood, IL 60153 |
| **Amber Fredrikson** | a.fredrikson143@gmail.com | 3125208952 | Unknown |

ID: [redacted]

Title: Report a safety incident involving a driver

User Type: client

Please provide specific details about the driver's unsafe behavior : Driver tried to rap me and put me out under the vacant lot

Rickia Williams

Thu, 14 Mar 2024 02:11:03 GMT

via inappsupport (external)

Hi Rickia,Thank you for taking the time to reach out and share your experience with us. We know sharing the details of this experience may have been difficult and we appreciate you trusting us with your report.While I know that this does not make up for your experience, I have also issued a full refund to your payment method. You should see the return in the next 3-5 days. Additionally, you may receive another call if the Investigations team has any additional questions for you.Uber Resources HotlineI have submitted your information to the Uber Resources Hotline run by the nonprofit RAINN. This hotline can:
Provide confidential, emotional support from RAINN's support specialistsHelp you receive reimbursement from Uber for therapy and other servicesGive you other helpful information and resourcesYou can call the hotline at 844.958.2378, Monday-Friday from 9AM-7PM ET using your PIN 8968792-RI. This PIN is unique to you, and you'll need it each time you call. These services are available until a year from today.National Sexual Assault HotlineIn addition to the specific services facilitated by the Uber Resources Hotline, you can always access RAINN's 24/7 National Sexual Assault Hotline by phone (800.656.HOPE) or Live Chat for confidential support and referrals to free and low-cost resources through local sexual assault service providers. RAINN can also provide you information about the criminal justice process in case you're considering contacting law enforcement.Law Enforcement ReportingWe believe the decision to report to law enforcement is entirely up to you. If you decide to report this to police, please provide law enforcement with our online portal address: lert.uber.com. Through this portal they can connect with our Law Enforcement Response Team to request information they may need for their investigation.You do not need to report to law enforcement in order to call the hotline numbers above.Thank you for bringing this to our attention.

[redacted]

Thu, 14 Mar 2024 03:16:33 GMT

via agent (external)

ID: [redacted]

Title: My driver was rude or unprofessional

User Type: client

Date of Trip:: 2024-06-01

Please tell us more about what happened with your driver:: My driver was rude he was cursin I asked to make a stop because it didn't let me off my Uber account I need a refund !

MARKENA KELLAR

Sat, 01 Jun 2024 07:54:57 GMT

via inappsupport (external)

We're sorry to hear about the experience you described with your driver on this trip, Markena .
This is certainly not the experience we want riders to have with Uber. Under no circumstances should a driver act in a way that makes you uncomfortable or unsafe.
We expect all users to follow our Community Guidelines and to treat each other respectfully. As a result of your claim, we'll reach out to your driver and take the appropriate action with their account. The driver's access to the Uber app will be evaluated accordingly.
I've added $5 in Uber Cash to your account. You can expect to see this reflected in your Uber Cash balance.
If we can help with anything else, please let us know.

[redacted]

Sat, 01 Jun 2024 08:32:59 GMT

via agent (external)

Why 5 dollars I need more he was very rude

MARKENA KELLAR

Sat, 01 Jun 2024 08:33:53 GMT

via inappsupport (external)

We understand the frustration here, Markena . The situation you have described is certainly not the experience we expect you to have.
Your statements are duly noted. Your safety and well-being are important to us and the behavior you described is unacceptable and against our Community Guidelines. We've already reached your driver to further investigate this matter and completing a full review of their account to evaluate whether or not they will continue to have access to the Uber app going forward.
Please continue to let us know of any issues with your drivers so we can provide you with the support you need. Should you have further concerns, just shoot us an email.

[redacted]

Sat, 01 Jun 2024 08:36:00 GMT

via agent (external)

ID: [redacted]

Title: Rider Discovery Bot Provide Driver Feedback

User Type: client

Chat requested

Name Unavailable

Mon, 04 Nov 2024 20:46:54 GMT

via system (external)

Hi amber, I'm here to help. Please choose an option below.

Uber Support

Mon, 04 Nov 2024 20:46:56 GMT

via agent (external)

Something else

amber fredrikson

Mon, 04 Nov 2024 20:46:56 GMT

via inappsupport (external)

Let's try another way. Please describe your issue in a few words below.

Uber Support

Mon, 04 Nov 2024 20:47:01 GMT

via agent (external)

he tried kicking me out of his car

amber fredrikson

Mon, 04 Nov 2024 20:47:14 GMT

via inappsupport (external)

Would you like to report this to our Safety team?

Uber Support

Mon, 04 Nov 2024 20:47:16 GMT

via agent (external)

Yes

amber fredrikson

Mon, 04 Nov 2024 20:47:16 GMT

via inappsupport (external)

Thank you for letting us know. We have created a ticket for our safety team. Tap below to see your support ticket and add any additional details.

Uber Support

Mon, 04 Nov 2024 20:47:18 GMT

via agent (external)

See Support Inbox

Uber Support

Mon, 04 Nov 2024 20:47:18 GMT

via agent (external)

Send us a message!
Please describe your issue below and we will do our best to respond within 6 to 12 hours.

Uber Support

Mon, 04 Nov 2024 20:47:18 GMT

via agent (external)

because of his mistake

amber fredrikson

Mon, 04 Nov 2024 20:47:24 GMT

via inappsupport (external)

I told him what entrance I needed to be picked up 5 minutes before his arrival

amber fredrikson

Mon, 04 Nov 2024 20:47:43 GMT

via inappsupport (external)

he never opened my message and then when I finally got a hold of him

amber fredrikson

Mon, 04 Nov 2024 20:47:55 GMT

via inappsupport (external)

and he came to where I was he was being condescending towards me

amber fredrikson

Mon, 04 Nov 2024 20:48:10 GMT

via inappsupport (external)

I explained that I've been picked up there before and that's why I sent the message before he arrived that he just needed to follow the signage on the building where it says emergency room entrance

amber fredrikson

Mon, 04 Nov 2024 20:48:52 GMT

via inappsupport (external)

he pulled his car over and told me he was denying my ride

amber fredrikson

Mon, 04 Nov 2024 20:49:04 GMT

via inappsupport (external)



I then told him sir I'm pregnant and I just want to go home. I've been here since 8 can you please just take me home

amber fredrikson

Mon, 04 Nov 2024 20:49:33 GMT

via inappsupport (external)

on top of that his music was super loud. which wasn't great for my migraine

amber fredrikson

Mon, 04 Nov 2024 20:49:58 GMT

via inappsupport (external)

and he drove as if he was irritated with me. driving in the parking lane. at some point he ended up pulling up behind a parked car thinking it was mobile then in realizing it was parked cause he was driving in the parking lane, went around it

amber fredrikson

Mon, 04 Nov 2024 20:51:11 GMT

via inappsupport (external)

Thanks for getting in touch, Amber.We have directed this matter to the most appropriate support team, who will be reaching out to you as soon as possible. In the meantime, if you feel more information could be helpful, please reply to this message.

[redacted]

Mon, 04 Nov 2024 20:54:23 GMT

via agent (external)

Hi Amber,
We are sorry to hear that your driver was performing illegal traffic maneuvers while driving which made you feel unsafe. This is definitely not the kind of experience we want you to have when requesting an Uber.
Drivers with Uber agree to maintain a high standard of professional service. This includes respect and being courteous towards everyone.
Based on your feedback, our systems have already been instructed not to match you with this driver again.
Our Community Guidelines state reports of unsafe driving can lead to loss of access to the app. We'll remind the driver of these guidelines and the importance of following local traffic laws.
We'll remind the driver of these guidelines and the importance of following local traffic laws.
We take the safety of riders and drivers very seriously. As a result of your report, we're reviewing this driver's account and will take appropriate actions.
We appreciate you taking the time to provide this feedback. As we work to continually improve the Uber experience for everyone, we value your perspective.

[redacted]

Mon, 04 Nov 2024 22:08:28 GMT

via agent (external)

ID: [redacted]

Title: A message from Uber

User Type: driver

Hi DAVID,We've received multiple reports from riders about problematic behavior associated with trips on your account. We previously notified you that repeated reports of a similar nature could lead to loss of account access. As a result, your account has been deactivated.We hold all Uber app users, including both riders and drivers, to the standards outlined in our Community Guidelines.While we understand this news may be upsetting, compliance with our guidelines is required to drive with Uber.If you think this deactivation was an error or can provide additional information (video, photo, or other documentation not previously submitted) that's relevant to your deactivation, you can request a review here. A member of our team will review your account and any information you provide with your review request. The review process usually takes 7 business days, but we sometimes need additional time. We'll send you an email letting you know the outcome of your review.If you're not requesting a review of your account status, please discard or return any Uber-branded decals or signage that you may have used for your vehicle as outlined in our Community Guidelines.Keep in mind, local and/or state laws in your area may prohibit the display of decals to impersonate a rideshare driver, and criminal penalties may apply.Thanks for your understanding.

[redacted]

Sun, 02 Jun 2024 05:34:52 GMT

via agent (external)