IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

David Martin,                      )
                                   )
        Plaintiff,                 )
                                   )
                                   )
                                   )
                                   )
    v.                             )  No. 26 cv 2431
                                   )
                                   )
Uber Technologies, Inc., a         )
Delaware Corporation, Rasier,      )
LLC, a Delaware limited            )
liability company, Lyft, Inc.,     )
a Delaware corporation, and        )
City of Chicago                    )
                                   )
        Defendants.                )

Memorandum Opinion and Order

According to the complaint in this case,[1] plaintiff David Martin began working as a rideshare driver in mid-February of 2024, using the well-known Uber and Lyft apps to connect with riders. His problems with Uber began almost immediately. He alleges that "[s]hortly after beginning to drive for Uber," he experienced "several bizarre incidents" involving female passengers. Compl., ECF 9 at ¶ 7. On February 26, 2024, plaintiff's Uber account was suspended following a rider complaint, but it was reactivated after

---

[1] The following narrative recounts the facts as plaintiff alleges them. While I accept them for present purposes, I do not vouch for their truth or accuracy.

an investigation. *Id.*, at ¶ 8. On March 13, a different rider "threatened to make a false report alleging attempted rape" after plaintiff mistakenly canceled her ride, leading to a second suspension the following day. His account was reactivated a month later, but he was warned that "further complaints could lead to permanent deactivation." *Id.* at ¶ 9. Plaintiff's account was permanently deactivated for "violations of community guidelines" on June 2, 2024, after unspecified "interactions" with three other riders. *Id.* at ¶ 10.

Plaintiff's experience driving for Lyft was likewise plagued with false complaints. *Id.* at ¶ 11. In or around mid-March 2024, a rider reported that plaintiff was drinking alcohol while driving, which was not true. Another rider reported that plaintiff was smoking marijuana while driving; that was also untrue. Plaintiff's account was temporarily deactivated after these incidents, but it was reactivated after an investigation. *Id.* Shortly after plaintiff's Uber account was permanently deactivated, however, his Lyft account was also permanently deactivated. *Id.* at ¶ 12.

On September 6, 2024, plaintiff filed a complaint in the Circuit Court of Cook County "to identify the riders who made complaints against [him] on the Uber platform and obtain the details of those complaints." *Id.* at ¶ 14. The following month, Uber reactivated plaintiff's account and made an offer of settlement, which plaintiff

2

rejected "because it would not address the underlying problem of the false complaints." *Id*. at ¶¶ 14-15.

Plaintiff resumed driving for Uber, but "more bizarre rider incidents" ensued. An "underdressed" female rider tried to engage plaintiff in "sexualized conversations." Another "bizarre incident" occurred involving a female rider with an account name plaintiff recalls as "Letsfuck." *Id*. at ¶¶ 16-17. Beginning around February 20, 2025, plaintiff was notified of "a surge of unsafe driving complaints on the Uber platform," but Uber did not provide him with sufficient information to allow him to respond to or dispute these complaints. As a result, his account was again deactivated on March 9, 2025. *Id*. at ¶ 19.

Meanwhile, the state court ordered Uber to identify the complainants and provide additional information about the complaints leading to the deactivation of plaintiff's account. *Id*. at ¶¶ 20. Uber identified three riders and provided details about their respective complaints, which concerned illegal traffic maneuvers and an attempted rape. *Id*. at ¶¶ 22-23. But because Uber did not provide two of the three complainants' home addresses, defendant was unable to "effectuate service upon them." *Id*. at ¶ 21. His state case was subsequently dismissed.

Plaintiff claims that he has unable to work as a rideshare driver with Uber or Lyft since his accounts were deactivated, thus losing what had been his primary source of income. And because Uber

3

and Lyft have effectively cornered the market on paid automobile transportation, *id*. at ¶ 1, the loss of this work has caused plaintiff extreme financial hardship. In particular, plaintiff pays over $650 a month in auto loan and insurance payments on a vehicle he bought in 2024 specifically for the purpose of working as a rideshare driver. Without income from Uber or Lyft, plaintiff fears that he will not be able to make his monthly payments, the vehicle will be repossessed, and his credit will be destroyed. *Id*. at ¶ 28.

Plaintiff filed this action against Uber and its wholly owned subsidiary, Rasier, LLC; Lyft; and the City of Chicago, claiming violation of various federal and state rights. Plaintiff organizes his claims into six counts: The first count, captioned "Request for Preliminary Injunctive Relief," alleges that his agreement with Uber contains an arbitration clause that he intends to initiate—and did in fact initiate contemporaneously with the filing of this law suit—but that he "seeks interim injunctive relief...to preserve the status quo and prevent irreparable harm while arbitration proceedings are pending." Compl. at ¶ 39. Specifically, he seeks an order: a) directing Uber "to immediately reactivate [his] account"; b) enjoining Uber from deactivating his account unless it "first presents to this Court a showing of good cause" and allows plaintiff an opportunity to respond; and c) directing Uber to provide him with details of the complaint and the complainant's contact information,

4

among other things, prior to deactivating his account in the future. *Id.* at 23.

Count II seeks a declaration that the arbitration agreement in his Uber's Terms of Service is unconscionable and unenforceable as applied to the claims he asserts here. Count III asserts antitrust claims against Uber under Sections 1 and 2 of the Sherman Act. Count IV asserts a due process claim against the City of Chicago pursuant to 42 U.S.C. § 1983, alleging that the City's application of Chapter 9-115 of its Municipal Code (the "TNP Ordinance"), which governs Transportation Network Providers such as Uber and Lyft, deprived him of his constitutionally protected interest pursuing his chosen occupation. Counts V-VII assert various claims against Lyft.[2]

Before me is a motion filed by defendants Uber and Rasier (collectively "Uber") pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 2 and 3 ("FAA") to compel arbitration and dismiss (or alternatively to stay) the complaint. For the reasons that follow, the motion is granted.

I.

The arbitration provisions at issue, which are materially identical across the various agreements that govern the parties' relationship and plaintiff's use of Uber's platform,[3] state:

---

[2] On April 16, 2026, plaintiff voluntarily dismissed with prejudice all claims against Lyft. ECF 27.

[3] Uber explains that individuals who wish to provide services through Uber's digital marketplace must agree to a "Platform Access Agreement" (or "PAA"). Uber asserts without contradiction that

5

> **IMPORTANT: PLEASE REVIEW THIS ARBITRATION PROVISION CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH US ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION, EXCEPT AS PROVIDED BELOW. YOU MAY OPT OUT OF THIS ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS BELOW ... IF YOU DO NOT OPT OUT OF THIS ARBITRATION PROVISION AND THEREFORE AGREE TO ARBITRATION WITH US, YOU ARE AGREEING IN ADVANCE, EXCEPT AS OTHERWISE PROVIDED BELOW, THAT YOU WILL NOT PARTICIPATE IN AND, THEREFORE, WILL NOT SEEK OR BE ELIGIBLE TO RECOVERY MONETARY OR OTHER RELIEF IN CONNECTION WITH, ANY SUCH CLASS, COLLECTIVE, COORDINATED, AND/OR REPRESENTATIVE LAWSUIT.**

Decl. of Steven Wong, ECF 20-1, Exh. D § 13 (bold font in original); *see also id.* at C § 15.3, E § 12, F § 13 (similar provisions). The arbitration provisions are drafted broadly to cover, with limited exceptions "all claims" between the parties. Further, the provisions include a delegation clause, which expressly empowers:

> [o]nly an arbitrator, and not any federal, state, or local court or agency...to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Provision, including without limitation any claim that all or part of this Arbitration Provision is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues.

Wong Decl., ECF 20-1, Exh. D at § 13.3(j).

Plaintiff acknowledges that "certain claims may be subject to arbitration," Resp., ECF 29 at 2, but argues that his claim for an injunction is properly before me because it falls within the limitation set forth in § 13.2 (e), which provides:

> Either party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief on the ground

---

plaintiff completed a series of steps to indicate his agreement with several of these: the 2014 Raiser Partner Agreement; the 2022 Rasier PAA; the 2020 PAA; and the 2022 Portier PAA. Mot., ECF 20 at 2-4.

that without such relief the arbitration provided in this Arbitration Provision may be rendered ineffectual."

*Id.*, Exh. D at 13.2(e). There are at least two problems with plaintiff's argument. First, contrary to plaintiff's characterization, § 13.2(e) is not a "carve-out" to otherwise applicable arbitration provisions. Resp., ECF 29 at 34. Rather, this provision acknowledges that courts retain "some equitable power...to issue preliminary injunctive relief in disputes that are ultimately to be resolved by an arbitration panel." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993); *Loc. Union 15, Int'l Bhd of Elec. Workers, AFL-CIO v. Exelon Corp.*, 191 F. Supp. 2d 987, 991 (N.D. Ill. 2001) (preliminary injunction is "available, in aid of arbitration, where the underlying dispute is subject to mandatory arbitration...and where an injunction is necessary to prevent arbitration from being rendered a meaningless ritual."). In other words, the preliminary injunctive relief contemplated by § 13.2(e) is a *complement* to arbitration, not an alternative to it. It does not support denial of Uber's motion.

Second, plaintiff's submissions do not satisfy the criteria necessary for the issuance of a preliminary injunction—"an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (internal quotation marks and citation omitted). A district court may exercise this power "to maintain the status quo without prejudice to the merits of any of the parties' claims or

7

defenses until an arbitration panel could consider the issues presented." *Salvano*, 999 F.2d at 215. But plaintiff's request for preliminary relief does not seek to preserve the status quo. Instead, it seeks to "reactivate" the account that was permanently deactivated over a year ago, on March 9, 2025. Moreover, because this amounts to a mandatory injunction, plaintiff's burden is especially high. *See Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) ("[m]andatory preliminary injunctions—those requiring an affirmative act by the defendant—are ordinarily cautiously viewed and sparingly issued.").

Nor has plaintiff demonstrated that absent an injunction, the arbitration will be a "meaningless ritual." Plaintiff contends that "structural barriers" inherent to arbitration prevent him from obtaining the relief he seeks in an arbitral forum. But having agreed to arbitrate "all claims" arising out of his relationship with Uber, he cannot now be heard to challenge the adequacy of that forum. *See Sauer-Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 350 (7th Cir. 1983) ("[i]t is too late for White to argue that arbitrators appointed under ICC rules lack the competence to adjudicate the validity of its contract. Had White thought so when it entered the contract, it would not have agreed to arbitrate 'any and all claims' before them.").

Finally, plaintiff has not alleged the type of irreparable harm that warrants preliminary injunctive relief. The injuries he claims are those that commonly attend the sudden loss of income: mounting

8

debts, an inability to repay loans, the potential loss of collateralized property, and negative credit ratings. Because financial losses are compensable through damages, they generally do not support the issuance of a preliminary injunction. *See*, e.g., *Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997). ("The rule is clear: monetary loss does not constitute an irreparable injury because a successful plaintiff can be adequately compensated at the conclusion of the litigation."); *Kendzierski v. Corey*, 615 F. Supp. 550, 552 (N.D. Ind. 1985) ("[t]he Supreme Court has made it clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.") (internal quotation marks and citation omitted).[4] Moreover, that plaintiff waited over a year after his Uber account was deactivated to seek a preliminary injunction cuts against a finding of irreparable injury. *See Ekanem v. Health & Hosp. Corp. of Marion Cnty.,* 589 F.2d 316, 321 (7th Cir. 1978) (plaintiff's fourteen-month delay in seeking preliminary injunction "undercut[] any claim of irreparable harm."). Plaintiff's failure to allege irreparable harm is an additional reason he cannot circumvent his agreement to

---

[4] Although there are exceptions to this rule "when the plaintiff risks insolvency; when he cannot continue his lawsuit in the absence of a preliminary injunction; when he may become insolvent before the dispute's resolution; or when damages are very difficult to calculate," *Bank of Am., N.A. v. Cartwright*, 545 F. Supp. 3d 666, 671 (N.D. Ind. 2021) (cleaned up), plaintiff's submissions do not suggest that any of these circumstances obtains here.

arbitrate his claims against Uber because he is entitled to preliminary injunctive relief.

Plaintiff next resists Uber's motion on the ground that the arbitration provisions' delegation clause—the provision granting the arbitrator exclusive authority to adjudicate "gateway" issues of arbitrability, "including enforceability, or formation of this Arbitration Provision, including without limitation any claim that all or part of this Arbitration Provision is void or voidable"—is unconscionable. This argument likewise fails to overcome Uber's motion.

In *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010), the Supreme Court explained that a delegation provision "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id*. at 70. The Ninth Circuit in Rent-A-Center held that where "a party challenges an arbitration agreement as unconscionable, and thus asserts that he could not meaningfully assent to the agreement, the threshold question of unconscionability is for the court." *Jackson v. Rent-A-Ctr. W., Inc.*, 581 F.3d 912, 917 (9th Cir. 2009). But the Supreme Court reversed, noting that "none of Jackson's substantive unconscionability challenges was specific to the delegation provision." 561 U.S. at 73. In other words, Jackson "did not contest

10

the validity of the delegation provision in particular." 561 U.S. at 74.

Here, plaintiff asserts *both* that the arbitration agreement as a whole, *and* the delegation provision specifically, are unconscionable. Under *Rent-A-Center*, however, I may not reach the enforceability of the agreement as a whole unless I first determine that the delegation provision—which on its face empowers only an arbitrator to decide that question[5]—is itself unconscionable. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152, 144 S. Ct. 1186, 1194, 218 L. Ed. 2d 615 (2024) (where parties' agreement "contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration."); *see also Lee v. Uber Techs., Inc.,* 208 F. Supp. 3d 886, 893 (N.D. Ill. 2016) (because the plaintiffs' challenge to the delegation provision lacked merit, their challenge to validity and enforceability of the arbitration agreement was for the arbitrator). Plaintiff has not made that showing.

Plaintiff argues that the delegation clause is unconscionable because it requires him to "pay AAA filing fees, enter the same limited-discovery forum whose structural inadequacy he is contesting, and present his unconscionability argument to an

---

[5] This includes plaintiff's argument that the arbitration provisions are unenforceable as against public policy. *See* Resp., ECF 29 at 26-32.

11

arbitrator whose authority derives from the very agreement he is challenging." Resp. ECF at 29. But plaintiff's assertion that the discovery available to him in arbitration is inadequate is conjecture. He complains that arbitration rules "provide[] for document exchange only at the arbitrator's discretion, not as of right," and argues that "without compulsory discovery," he will not have access to evidence he will need to establish his claims. Setting aside that district courts, too, exercise substantial discretion in overseeing discovery under the Federal Rules of Civil Procedure, plaintiff offers no basis for his assumption that an arbitrator's exercise of discretion will prevent him from obtaining the discovery he seeks. Moreover, if there is any authority for the suggestion that a delegation clause is unconscionable because the adjudicator it authorizes to adjudicate a particular issue is vested with discretion in exercising that authority, plaintiff has not cited it. Similarly speculative is plaintiff's argument that an arbitrator will lack authority to compel the testimony of witnesses plaintiff deems essential to proving his claims. In short, I am not persuaded that the delegation clause is unconscionable because it requires plaintiff to pay filing fees or because the discovery available to him in arbitration is inherently inadequate.

Finally, plaintiff resists arbitration of his claims against Uber on the ground that the City of Chicago – who has yet to be served in this case – did not agree to arbitrate. True, but

12

irrelevant to Uber's motion, which seeks dismissal of the action only as to it. Plaintiff's claim against the City of Chicago remains pending.[6]

## II.

In a post-script to the parties' briefs, plaintiff filed a notice of supplemental authority, calling my attention *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358 (2026), which the Supreme Court handed down after the close of briefing. In *Flowers*, the Court addressed the scope of the exemption in Section 1 of the Federal Arbitration Act, which provides that "'nothing' in the law shall be used to compel arbitration in disputes involving the 'contracts of employment' of any class of workers "engaged in ... interstate commerce.'" *Id*. at 1362 (quoting 9 U.S.C. § 1). In a statement accompanying his notice, plaintiff suggests that because his "work as a driver for Uber routinely included transporting passengers to and from O'Hare International Airport and Midway International Airport, where those passengers' trips to or from the airport were legs of an interstate or international journey," he "may fall" within § 1's exemption. ECF 48 at ¶ 5. These additional submissions do not warrant denial of Uber's motion.

To begin, as plaintiff correctly observes, the Supreme Court held in *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019), that

---

[6] As of the date of this decision, the City has not been served with process or appeared in the case.

13

"whether § 1's 'contracts of employment' exclusion applies" is an "antecedent" inquiry that "a court should decide for itself...before ordering arbitration." *Id*. at 111. Indeed, the *New Prime* Court explained that because § 1 concerns the court's authority to enforce private arbitration agreements covered by the FAA, courts must resolve any questions about the scope of that authority before examining the terms of an arbitration agreement. *See id.* ("to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2."). This is not new law. And although "[p]laintiffs have the burden of proving that the [transportation-worker] exemption applies," *Aleksanian v. Uber Techs. Inc.,* No. 19-CV-10308 (ALC) (RWL), 2026 WL 836134, at *7 (S.D.N.Y. Mar. 26, 2026) (quoting *Capriole v. Uber Technologies, Inc.*, 460 F. Supp. 3d 919, 928 (N.D. Cal. 2020), *aff'd*, 7 F.4th 854 (9th Cir. 2021)), plaintiff nowhere argues in his response or sur-reply briefs that his agreements with Uber fall within the § 1 exemption.

Even assuming that plaintiff has not forfeited this argument, it is not one that has met with success among the courts that have considered it. In *Alexanian*, for example, the court allowed discovery into issues that "might" be relevant to the § 1 inquiry, including:

> Uber's policies regarding interstate trips; the potential penalties and costs of declining interstate trips; Uber's revenue from interstate trips; the average number of interstate trips Uber drivers take over various time

> periods (such as a week, a month, or a year); the median number of interstate trips for Uber drivers over various time periods; what percentage of Uber drivers take interstate trips over various time periods; how often Uber drivers decline interstate trips[.]

*Aleksanian*, 2026 WL 836134, at *3. The court reviewed "thousands of pages of documents and data for more than a hundred discrete metrics for [Uber's] operations between 2013 and 2019 as they relate to interstate transportation" and concluded that "Uber drivers...are not 'engaged in ... interstate commerce' as that term is used in Section 1 of the FAA." *Id*. at *3, *8. The court noted that its conclusion in this connection was consistent with "the decisions of a growing majority of federal courts," *id*. at *8, citing cases such as *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 557, 560 (3d Cir. 2023), *as amended* (May 4, 2023).

In *Singh*, the Third Circuit held that "a class of workers comes within the exception only if 'interstate movement of goods' or passengers is 'a central part' of the job description of the class," (quoting *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020)). Examining the evidence of the "relevant class," which it defined as "nationwide Uber drivers," *id*. at 556, the court concluded that because "most Uber drivers have never made a single interstate trip," while their intrastate duties, "such as driving riders to and from airports," were not a "'constituent part' of the interstate movement of goods or people," they did not fall within § 1's exemption. *Id*. at 560. *See also id*. at 562 (rejecting argument

15

"that drivers who ferry passengers to and from airports are part of an integrated interstate transport effort.").

As the *Aleksanian* court noted, all three courts of appeals to have considered the standard for determining what "constitutes a transportation worker who is engaged in interstate commerce" have embraced the Seventh Circuit's analysis in *Wallace*, which focuses on whether interstate transportation is "a central part of the job description of the class of workers" to which the plaintiff belongs. *Id*. at *9 (quoting *Wallace* 970 F.3d at 803. In each of these case, the court concluded that rideshare drivers were not within the scope of § 1. *See Singh*, 67 F.4th at 557; *Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 864 (9th Cir. 2021); *Cunningham v. Lyft, Inc.*, 17 F.4th 244, 252 (1st Cir. 2021).

I am not convinced that *Flowers* compels a contrary conclusion. *Flowers* did not overrule or even mention any of the cases cited in the preceding paragraph. Indeed, the ruling in *Flowers* was narrow: it considered, and rejected, "a bright-line rule that an individual can never qualify for § 1's exemption unless he crosses state lines or interacts with vehicles that do," explicitly declining to pass upon the "legal significance" of the kinds of facts lower courts had found "relevant when assessing § 1's reach."

A final note: plaintiff asks me to stay the action rather than dismiss it if I conclude that his claims are subject to arbitration. "When a district court finds that a lawsuit involves an arbitrable

16

dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472 (2024)

III.

For the foregoing reasons, Uber's motion to compel arbitration and stay this action is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: June 24, 2026

17